Rel: September 12, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## SPECIAL TERM, 2025

_____

### CL-2024-0883

_____

### Lisa Moore Haywood n/k/a Lisa Moore

### v.

### Carl Ray Haywood

### Appeal from Walker Circuit Court
### (DR-15-900005.06)

HANSON, Judge.

Lisa Moore Haywood, now known as Lisa Moore ("the former wife"), appeals from a judgment of the Walker Circuit Court ("the trial court") that, among other things, found her in contempt for her failure to pay Carl Ray Haywood ("the former husband") certain income distributions

from corporate earnings awarded to the former husband in the parties' divorce judgment.

## Background

The parties were divorced in 2017. The October 18, 2017, divorce judgment, among other things, awarded the former husband a 35% interest in the corporation Emergency Response Specialists, Inc. ("ERS"), which had been jointly owned by the parties. That judgment provided, in pertinent part:

> "The couple's largest asset is Emergency Response Specialist, Inc. ERS was incorporated by Mrs. Moore as Emergency Response Management and Training Corporation. The name was changed from ERMA and T to ERS in 1993.

> "Mrs. Moore and Mr. Haywood both worked in the Corporation from 1994 to 2015 when Mrs. Moore terminated Mr. Haywood from the business. During their years together, the couple grew the Corporation from a small business to a large corporation worth seven figures. Mrs. Moore led the company in several areas of success and Mr. Haywood provided at least two patents to streamline the business. He was also the day-to-day person through the years.

> "There is some disagreement regarding the shares of the Corporation owned by each party. Mrs. Moore argued that Mr. Haywood only has a 5% interest in the Corporation with her having the remaining 95%. The corporate stock share certificates and a 1995 letter from a corporate attorney to Mrs. Moore evidence only a 5% interest.

"On the other hand, from 2007 through 2015, the Corporation represented to the Federal Internal Revenue Service and the Alabama Department of Revenue that Mr. Haywood had a 35% interest in the Corporation with Mrs. Moore having the remaining 65% of the firm. The representations to the tax entities were initiated by an email from Mrs. Moore to the Corporation's Accountant stating the shares were to be divided 65-35.

"The 65-35 split was also recognized by the parties in their receipt of shareholder distributions for the years 2007 through 2015. Mrs. Moore received over 60% of the distributions with Mr. Haywood receiving the remaining portion. The distributions averaged $145,093 per year for Mrs. Moore and $89,295.00 per year for Mr. Haywood.

"Considering the tax filings and the income distributions from the Corporation, the Court finds that Mrs. Moore has 65% of the Corporation's shares. Mr. Haywood has the remaining 35% of the shares. Mr. Haywood made an argument that he believed he was owed 50% of the Corporation because it was a marital asset. The Court agrees that the Corporation is a marital asset but for close to 8 years, Mr. Haywood received 35% of the income and did not seem[] bothered by it especially when the couple lived separate and apart from each other for the last 4-5 year[s] of their marriage.

"The next issue for the Court is the value of the Corporation. Mrs. Moore offered a value of $1,520,965.00. Mr. Haywood's business expert placed the value of the Corporation at $1,850,000.00. However, the most credible witnesses to the Court for valuation were Mr. Haywood's expert for the Corporation's real and personal property value and the Corporation's accountant. The property was valued at $1,650,00.00. The couple's accountant valued the remainder of the Corporation at $629,00.00. Pursuant to the accountant's testimony to obtain the full value you add her valuation plus the property value for the Corporation's total

3

value of $2,279,000.00. Hence, the Court finds the value of the Corporation as $2,279,000.00.

"One last issue is money owed to Mr. Haywood by the Corporation for his participation in and managing litigation involving the Corporation. In an effort to keep waste from happening with the Corporation, the Court ordered Mrs. Moore and Mr. Haywood to divide responsibilities for two lawsuits involving the Corporation. Mr. Haywood was to be compensated by the Corporation at a rate of $100.00 an hour. At the time of the final hearing, he was owed $22,410.00.

"After taking in consideration the facts and the Court's findings, the Court ORDERS and DECREES the following:

"….

"EMERGENCY RESPONSE SPECIALIST, INC.

"Mrs. Moore will retain her 65% of the shares of Emergency Response Specialist. Inc.  Mr. Haywood will be divested of his shares in the Corporation to Mrs. Moore over the course of nine years. Mrs. Moore will remit to him payments in the amount of $88,628.00 each year by December 31 starting immediately. Each payment will be sent by Certified US Mail to an address provided by Mr. Haywood to Mrs. Moore.

"Mrs. Moore may at any time prior to the end of the nine years, remit to Mr. Haywood the amount of $797,652.00 less any payments she has made to the lump sum payment. Upon the remittance of the lump sum amount of $797,652.00, Mr. Haywood will be divested of his shares in the Corporation.

"Unless Mrs. Moore has made a lump sum payment, at the conclusion of three-year increments, Mr. Haywood will transfer one-third of his shares in the Corporation to Mrs. Moore until such time as all of the payments are made. Until

4

the shares are transferred, Mr. Haywood will receive income profit and loss distributions from the Corporation the same as any other shareholder. Also, Mr. Haywood will be able to exercise his rights as any other shareholder in a corporation under the law of the State of Alabama and the Federal government.

"….

"ALIMONY IN GROSS

"Within 90 days of this Decree, Mrs. Moore as the President of ERS is to remit to Mr. Haywood $22,410.00."[1]

(Capitalization in original.)

On December 14, 2020, the former husband filed a contempt petition, alleging that the divorce judgment had provided that the former wife has to purchase his 35% interest in ERS while continuing to pay him shareholder distributions from ERS until the former wife completes the buyout of the former husband's interest. The former husband alleged that neither the wife nor ERS had distributed any profits to him during 2018 or 2019, noting that the former wife had made an early payout of his 35% interest in ERS in 2019. The former husband also alleged that

---

[1]Both the former husband and the former wife appealed from the divorce judgment. This court affirmed the judgment. See L.M. v. C.R.H., 292 So. 3d 332 (Ala. Civ. App. 2019) (table); C.R.H. v. L.M., 298 So. 3d 456 (Ala. Civ. App.) (table), cert. denied, Ex parte C.R.H., 316 So. 3d 229 (Ala. 2019) (table).

the former wife had made only partial distributions from ERS's income in 2016 and 2017. The former husband further alleged that neither the former wife nor ERS would allow him to review ERS's records. On April 27, 2021, the former wife filed a motion to dismiss the contempt petition or, in the alternative, to "limit the scope of the inquiry" to the period between the date of the divorce judgment (October 18, 2017) and the date the former wife completed the purchase of the former husband's shares in ERS. On August 8, 2021, the former husband filed a response to the former wife's motion. On August 11, 2021, the trial court entered an order stating that the former wife's motion would be heard at a final hearing in the matter.

On September 8, 2021, the trial court entered an order setting the trial for December 13, 2021, and requiring the parties to complete discovery 30 days before the trial. The former wife objected to certain discovery requests. On February 24, 2022, the trial court entered an order addressing the former wife's objection. On October 11, 2022, the trial court entered an order setting the trial for February 1, 2023.

On December 23, 2022, the former wife filed a pleading responding to the former husband's contempt petition. That same day, the former

6

wife filed a motion for a summary judgment along with attachments in support of the motion. On February 4, 2023, the husband filed a motion opposing the former wife's summary-judgment motion along with attachments. Following a hearing, the trial court denied the former wife's summary-judgment motion on February 7, 2023.

At the trial, which was ultimately held on July 23, 2024, the former husband testified that he had a 35% stake in ERS and that he and the former wife had been the only shareholders.[2] The former husband acknowledged that, under the terms of the divorce judgment, the former wife was to buy his 35% interest for $797,652. He also acknowledged that, although the former wife could have made payments over several years to purchase his interest, she had paid a lump sum to purchase his interest in January 2019, on the 29th or 30th day of that month.

The former husband testified that, in his view, pursuant to the divorce judgment, he was entitled to shareholder distributions from ERS while the former wife completed the "buyout" of his 35% interest. The

---

[2]ERS's general ledgers from 2016, 2017, and 2018 along with ERS's profit and loss statement from January 2019, ERS's 2017 federal-income-tax form, the former wife's 2018 federal-income-tax form, and a document reflecting ERS's cash flow from 2017 to 2019 were admitted into evidence.

former husband testified that he did not receive any shareholder distributions after the divorce judgment had been entered on October 18, 2017. The general ledger for ERS, which was admitted into evidence, indicated that the former wife had received a distribution of $219,789.95 in 2018. The former husband testified that his 2018 Schedule K-1 income-tax document showed a "pass-through" profit from ERS, which was a "subchapter S" corporation, based on his 35% interest, in the amount of $160,341. The former husband stated that he had had to pay income tax on that $160,341 amount but that he had received no income distribution from ERS in 2018. The former husband's 2017 Schedule K-1 document reflected a profit from ERS attributable and taxable to him in the amount of $112,706. The former husband admitted that he had received $72,354 from ERS in 2017.

The former husband testified that the former wife had asked him in 2015 if he was familiar with the term "squeeze play" and that she had stated that he should look up that phrase because he would never get another dime from ERS. The former husband explained that he received no money from ERS after the entry of the divorce judgment. The former husband testified that, at the beginning of 2016, ERS had $460,178 in

8

undistributed retained earnings. He further stated that there were $26,348 in undistributed retained earnings later in 2016. The former husband testified that $26,348 in earnings were not distributed to the shareholders in 2016. The former husband testified that ERS had had undistributed retained earnings in the amount of $109,994 in 2017 and that ERS had had income in the amount of $456,866 in 2018.

The former husband explained that, depending on the year, ERS would, at a minimum, distribute to the two shareholders the amount of the quarterly taxes owed and that, if there was money available, the shareholders would thereafter receive larger distributions. The former husband stated that in 2016 ERS had earned $310,000 in income and had distributed $283,000 to him and the former wife according to their ownership percentages in ERS. The former husband stated that ERS had earned $317,000 in 2017 but had distributed only $207,000. The former husband testified that ERS had earned $457,000 in 2018 but that there had been no shareholder distributions. The former husband indicated that $220,000 appeared to have been distributed, but that he had received nothing. The former husband testified that he was asking the trial court to award him distributions from 2016, 2017, 2018, and

9

2019. The former husband asked for an amount of $5,000 in attorneys' fees. The former husband admitted that, after the entry of the divorce judgment in 2017, he had received $22,410 from ERS as reimbursement for fees he had paid to a law firm to represent ERS in a lawsuit.

Rebecca Parcus, a certified public accountant, testified that she had prepared ERS's corporate tax returns in 2017 and 2018. Parcus testified that ERS's 2018 general ledger indicated that the former wife had received a shareholder distribution in the amount of $219,789.95. Parcus testified that that entry in the ledger was a carryover from 2017 of the total shareholder distributions to the former wife and the former husband. When asked to explain the difference between cash and retained earnings, Parcus stated that "cash is cash" but that retained earnings are any net income that has not been distributed. She further stated that because retained earnings are on the "accrual basis of accounting" and not the "cash basis," retained earnings do not always "tie to cash" because a company might have changes in accounts receivable and accounts payable.

Parcus testified that ERS's distribution percentages for the former wife and the former husband were 65% and 35%, respectively. Parcus

was asked about a $145,000 loan the former wife had obtained from ERS in 2018; Parcus responded that she was unaware of a repayment plan for the loan. Parcus stated that she also had prepared the former wife's personal tax form and that the $145,000 loan was not listed on that form as income. Parcus acknowledged that the former wife had not paid interest on the loan. Parcus testified that the former wife's 2018 income-tax return showed that ERS had paid the former wife $143,961 in wages. Parcus admitted that the $145,000 loan was not listed on the former wife's tax return.

Parcus testified that the former wife's salary from ERS in 2017 had been $64,200. Parcus also acknowledged that the former wife's salary from ERS in 2018 had been $143,961. Parcus was asked if this was a 224% increase but later clarified that the change amounted to a 124% increase in salary. Parcus agreed that the former wife's 2018 salary and the $145,000 loan to the former wife represented approximately 65% of ERS's income in 2018. Parcus acknowledged that the former husband received no income from ERS in 2018.

On August 14, 2024, the trial court entered the following final judgment:

"On July 23, 2024, this case came before the Court for a hearing on Carl Ray Haywood's ('Haywood') [p]etition … against his former wife, Lisa Moore ('Moore'). Specifically, whether Haywood is due to be paid certain distributions from corporate earnings consistent with the Court's Divorce Decree. Haywood, and his attorney Russell B. Robertson, were present in court. Moore and her attorney, Thomas Baxter, appeared in court.

"Having heard and given proper consideration to the witnesses' testimony and evidence offered by the parties, the Court FINDS the following:

"On October 28, 2017, this Court divorced Haywood and Moore. At the time of the divorce, Haywood and Moore were the sole shareholders of ERS, Inc. ('the Corporation'). Haywood owned 35% of the Corporation's shares. Moore owned the remaining shares. As the sole shareholders, Haywood and Moore made the decisions regarding the Corporation's actions.

"At the end of 2016, the Corporation had 'undistributed retained earnings' in the amount of $486,526. Haywood's share of the earnings was $170,284. If the Corporation elected to distribute the shares, Haywood and Moore would receive their portions in 2017. The Corporation did not distribute the earnings to Haywood or Moore. Even though Haywood did not receive an actual earnings payment, he paid taxes on his undistributed retained earnings' share.

"In 2017, the Corporation had retained earnings of $109,994. Haywood did not receive any of the earnings even though he was credited with $38,498 of the undistributed retained earnings and paid income taxes on the same. If the Corporation elected to distribute the shares, Haywood and Moore would receive their portions in 2018.

12

"For 2018, the Corporation had retained earnings of $456,140.00. Haywood's share of the earnings was $159,649.00. Moore's share was $296,491.00. If the Corporation elected to distribute the earnings, Haywood and Moore would receive their portions in 2019.

"Apparently in 2019, the Corporation did elect to distribute Moore's share of the earnings, $296,491.00, to her. The Corporation's General Ledger showed the earnings distribution to her. The Corporation's accountant testified that neither party received a distribution. She stated that Moore's earnings distribution was not actually distributed to her as evidenced by an accounting entry of a corresponding debit transaction.

"In 2019, Moore purchased Haywood's interest in the Corporation. Prior to this transaction, the Corporation had $25,947.58 in earnings, with no distributions to either party. Haywood was taxed on his 35% share of those earnings.

"Haywood and Moore's divorce was a contentious affair. The couple's main asset and major flashpoint was the Corporation. The Corporation was a successful venture. Each year, the Corporation paid earnings to the couple. It provided Haywood and Moore an enjoyable lifestyle. But Moore promised Haywood that after an order divorcing the couple was entered, she was going to make sure he did not receive 'a dime' from the Corporation. She was going to execute a strategy called a 'squeeze-out play.'

"It is apparent that Moore's promise to Haywood that he would not receive a dime from the Corporation after the divorce was a promise she was making sure to come true. This despite the Court ordering Haywood to '... receive income, profit, and loss distribution from the Corporation the same as any other shareholder.' See Divorce Decree. After the divorce, Moore would exercise complete control over the Corporation.

13

"The Court understands a corporation may elect to not distribute earnings, but Haywood and Moore's corporation routinely distributed earnings prior to the Decree of divorce. The Corporation funded the couple's lifestyle. After the Decree, the Court was not presented with any evidence related to the exercise of any business judgment (nor any other justification) to explain the Corporation suddenly ceasing in making earnings distributions. The only reasonable explanation is that after the divorce, Moore had total control of the Corporation, and she elected not to make distributions.

"In 2018, Moore was managing the Corporation without any input from Haywood. She had control of the Corporation's decision making for its 2016, 2017, 2018, and 2019 earnings distribution. Moore offered no explanation for her decisions concerning the distribution of the Corporation's earnings, or the presentation of any information concerning any mitigating factors in opposition to Haywood's testimony and evidence. As a matter of fact, Moore did not take the stand to dispute anything testified to or bolster any argument on her behalf or the Corporation's behalf. By staying at her table Moore essentially agreed to the testimony provided by Haywood.

"The Corporation did make unusual distributions in 2018. First, the Corporation paid Moore an annual salary of $143,961.00. This was a 224% salary increase over previous years.[3] Second, the Corporation 'loaned' Moore $145,000.00. No evidence was presented that the loan was ever paid back or intended to be paid back, nor did the Corporation document the transaction.

"2018's salary and loan distributions to Moore totaled $288,961.00, which is 63% of the Corporation's entire retained

---

[3]As stated earlier, Parcus clarified that the former wife's salary had increased by 124% from 2017 to 2018.

earnings for the same year. This number is nearly 65% of the Corporation's 2018 retained earnings of $456,140.00. 65% is Moore's share of the ownership of the Corporation and would have been her share of the earnings if distributed. The Court cannot reasonably consider the same to be a mere coincidence.

"Haywood did not receive any 2018 earnings, nor did he receive a salary or a loan. His share of the earnings would have been $160,341.00. Haywood did pay taxes on his share of undistributed earnings.

"To allow Moore to enrich herself with voluminous distributions from the Corporation's earnings, even if they are titled 'increased salaries' and 'loans,' while denying Haywood his proportionate share of the distributions of the Corporation's earnings is contrary to the Decree and the intent of the Decree, and constitutes a manifest injustice. The sequence of substantial payments to Moore accompanied by $0 in distributions to Haywood demonstrates a clearly intentional and well-executed plan to deprive Haywood of his intended and court-ordered share of the distributions of the Corporation.

"No evidence was offered to support any proposition that Haywood's share should have been something less than the 35% of the undistributed retained earnings on which he was taxed. Moore's position at trial was that Haywood should have received what he received, in other words, nothing or in her words not 'a dime.'

"Due to Moore refusing to allow the Corporation to distribute earnings to Haywood, he was denied the opportunity to invest the money awarded to him in the divorce judgment. Thus, he is entitled to post judgment interest on the same. The amounts of post judgment interest as computed for each year from the last day of the respective year to the date of this Order and using the State of Alabama statutorily authorized judgment interest rate amount is as follows:

15

"2016 $86,207.00

"2017 $19,008.00

"2018 $67,143.00

"2019 $3,122.00

"Total $175,480.00

"Therefore, the Court finds that Carl Ray Haywood's [p]etition … against Lisa Moore is GRANTED; subsequently, the Court ORDERS the following:

"1) Lisa Moore is to pay Carl Ray Haywood $378,205.00 which is his 35% share of the 2016, 2017, 2018, and 2019 earnings of ERS, Inc. plus the interest accrued of $175,480.00. This payment is to take place within 90 days of the date of this Order. If not paid, this payment amount will become a judgment against Moore and in favor of Haywood for which execution can result.

"2) Haywood is awarded attorney fees and expenses in the amount of $5,000.00, which shall be paid to him by Moore within 90 days of the date of this Order.

"3) Any other issues or motions not addressed in this Order are deemed moot or denied.

"4) Court costs of this matter are taxed against Moore."

(Capitalization in original.)

The former wife filed a postjudgment motion on September 13, 2024, arguing, among other things, that the burden was on the former

husband to show that ERS had an obligation to distribute income to the shareholders, that there was no evidence indicating that the income retained by ERS was not done in compliance with §10A-2A-6.40, Ala. Code 1975, that any claim that ERS owed money to the former husband from 2016 and 2017 was barred by the doctrine of res judicata or collateral estoppel, that the trial court's findings of fact were not supported by the evidence, and that the trial court had improperly assessed statutory interest of 7.5% because no fixed judgment amount existed. On September 25, 2024, the trial court denied the motion. The former wife timely filed her notice of appeal.

<u>Standard of Review</u>

The former husband's petition sought to hold the former wife in contempt for failing to comply with the divorce judgment. Rule 70A(a)(2)(D), Ala. R. Civ. P., defines civil contempt as "willful, continuing failure or refusal of any person to comply with a court's lawful writ, subpoena, process, order, rule, or command that by its nature is still capable of being complied with." Concerning civil contempt, this court has stated:

> "'"'The failure to perform an act required by
> the court for the benefit of an opposing party

constitutes civil contempt.' <u>Carter v. State ex rel. Bullock County</u>, 393 So. 2d 1368, 1370 (Ala. 1981)." <u>J.K.L.B. Farms, LLC v. Phillips</u>, 975 So. 2d 1001, 1012 (Ala. Civ. App. 2007). Furthermore, "'[t]he purpose of a civil contempt proceeding is to effectuate compliance with court orders and not to punish the contemnor.' <u>Watts v. Watts</u>, 706 So. 2d 749, 751 (Ala. Civ. App. 1997)." <u>Hall v. Hall</u>, 892 So. 2d 958, 962 (Ala. Civ. App. 2004).'

"<u>Reed v. Dyas</u>, 28 So. 3d 6, 8 (Ala. Civ. App. 2009)."

<u>Hood v. Hood</u>, 76 So. 3d 824, 831-32 (Ala. Civ. App. 2011).

The trial court received both oral and documentary evidence at the trial (<u>see</u>, e.g., note 1, <u>supra</u>); therefore, the ore tenus rule applies.

"A judgment based on disputed evidence presented ore tenus is generally afforded a presumption of correctness on appeal. <u>See</u> <u>Sconyers v. Sconyers</u>, 808 So. 2d 61, 63 (Ala. Civ. App. 2001). A trial court in an ore tenus proceeding is in a singular position to observe witnesses and to evaluate their demeanor and credibility. <u>See</u> <u>Ex parte T.V.</u>, 971 So. 2d 1, 4 (Ala. 2007). An appellate court will affirm a trial court's judgment in such a proceeding if, under any reasonable view of the testimony, there is credible evidence to support the judgment, and it will not disturb the findings of the trial court unless they are clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. <u>See</u> <u>L.S. v. A.S.</u>, 272 So. 3d 169, 179 (Ala. Civ. App. 2018).

"When a party argues that the trial court erred as a matter of law, however, this court will review the judgment de novo. <u>See</u> <u>Espinoza v. Rudolph</u>, 46 So. 3d 403, 412 (Ala. 2010). The ore tenus rule does not extend a presumption of

correctness to a trial court's conclusions of law or its application of the law to the facts. Id."

Curtis v. Curtis, 367 So. 3d 1088, 1096-97 (Ala. Civ. App. 2021).

Discussion

Section 10A-2A-6.40

The former wife argues that the trial court erred in awarding the former husband distributions from ERS because, she says, § 10A-2A-6.40(a), Ala. Code 1975, provides that a board of directors "may" authorize distributions to shareholders but does not mandate distributions.

Section 10A-2A-6.40 provides, in pertinent part:

"(a) The board of directors may authorize and the corporation may make distributions to its stockholders subject to restriction by the certificate of incorporation and the limitation in subsection (c).

"....

"(c) No distribution may be made if, after giving it effect:

"(1) the corporation would not be able to pay its debts as they become due in the usual course of business; or

"(2) the corporation's total assets would be less than the sum of its total liabilities plus (unless the certificate of incorporation permits otherwise) the amount that would be needed, if the

19

> corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of stockholders whose preferential rights are superior to those receiving the distribution."

The former wife's argument regarding § 10A-2A-6.40 is that, under Alabama corporate law, ERS was not required to make any distributions. The former wife is correct that distributions under § 10A-2A-6.40 are discretionary rather than mandatory. However, this case concerns whether the former wife violated the provisions of the divorce judgment, not whether general principles of corporate law were violated.

We note that the trial court, in its contempt judgment, stated that it had not been presented with any evidence indicating that the former wife made a "business judgment" or had a justification for "suddenly ceasing" annual shareholder distributions from ERS. The "business-judgment rule" generally insulates the acts of officers or directors done in good faith and with sound business judgment from interference by the courts. Michaud v. Morris, 603 So. 2d 886, 888 (Ala. 1992). For the business judgment rule to apply, the officer or director must be a disinterested officer or director. See Roberts v. Alabama Power Co., 404 So. 2d 629 (Ala. 1981) (holding that upon finding that a special committee

of disinterested directors had determined in good faith and after investigation that it was not in the company's best interests to allow shareholder derivative action to proceed, business-judgment rule would not allow court to interfere with committee's determination). The trial court noted that the former wife had managed ERS and had had control of whether to distribute earnings from 2016 to 2019. The trial court also recognized that the former wife had essentially made distributions to herself from ERS in the form of "increased salaries" and "loans" while denying distributions to the former husband. Accordingly, the business-judgment rule was inapplicable here, because the former wife was not disinterested when she made ERS's business decisions regarding the former husband's distributions.

Distributions

2016

Next, the former wife argues that the trial court erred in awarding the former husband additional distributions with respect to 2016 because, she says, the divorce judgment was entered on October 18, 2017, and, after 30 days had elapsed following the entry of that judgment, the trial court lost jurisdiction to award the former husband any amount not

21

referenced in the judgment. She also argues that any 2016 distributions to the former husband were barred by "law of the case."

In support of her argument that the former husband was not entitled to distributions for 2016, the former wife cites Burgess v. Burgess, 99 So. 3d 1237 (Ala. Civ. App. 2012). In Burgess, on July 29, 2011, a circuit court entered a final judgment, which had incorporated the parties' settlement agreement. On August 11, 2011, the husband filed a postjudgment motion. On August 16, 2011, the wife filed a response to the husband's postjudgment motion. On August 30, 2011, the wife filed an amended response and a postjudgment motion in which she argued that the husband owed her for debts incurred before the judgment was entered. This court held that the wife's postjudgment motion was untimely. We further held that the husband's pending postjudgment motion did not allow the circuit court to amend the divorce judgment so as to award the wife monetary relief that could have been addressed in the original judgment.

Burgess is inapposite to the present case. The trial court's contempt judgment did not amend the divorce judgment. The divorce judgment was entered on October 18, 2017. The divorce judgment did not order the

former wife to pay distributions from any given year but, instead, provided that, <u>until</u> the former wife purchased the former husband's interest in ERS, the former husband would receive distributions from ERS in the same manner as any other shareholder. This necessarily included profits which were owed at the time the divorce judgment was entered (so long as the former wife had not completed her purchase of the former husband's interest). Following the trial on the contempt petition, the trial court, based on the evidence presented, found that the former wife had violated the divorce judgment by not paying the former husband distributions from ERS's 2016 income to the former husband in 2017. Because the distribution was ordered in the divorce judgment, and because a trial court has the authority to enforce its judgments, <u>see</u> <u>Jardine v. Jardine</u>, 918 So. 2d 127 (Ala. Civ. App. 2005) (holding that a trial court had the inherent authority to interpret, implement, or enforce a divorce judgment it had entered in a contempt proceeding commenced months after the entry of the divorce judgment), the former wife's reliance on <u>Burgess</u> is misplaced.

The law-of-the-case doctrine provides that "once an issue has been decided in a divorce action, … reconsideration of that issue in subsequent

23

modification and enforcement actions arising out of the divorce judgment" is precluded. Ex parte Fipps, 317 So. 3d 999, 1003 (Ala. Civ. App. 2020). The former wife refers to a postjudgment motion filed by the former husband following the entry of the divorce judgment on October 18, 2017, specifically citing a page therein where he had argued that the division of the marital property was inequitable because the former wife had not been ordered to reimburse him for certain attorneys' fees he had paid on behalf of ERS and that the former wife had not made certain 2016 distributions from ERS for which he had paid taxes. The former husband's postjudgment motion following the entry of the divorce judgment did not bar the trial court from enforcing the terms of the original divorce judgment. In this action, the former husband asked the trial court to enforce the terms of the divorce judgment, which did not provide a specific time for the former wife to pay the distributions, but did provide that the former husband was entitled to distributions until she completed her purchase of the former husband's interest. The trial court did not exceed its authority by considering whether the former wife had complied with the divorce judgment. Cf. Garris v. Garris, 643 So. 2d 993, 995 (Ala. Civ. App. 1994) (holding that a trial court could clarify and

24

enforce its judgment as necessary to effect the unspoken intent of that judgment).

## 2017

The former wife argues that the former husband's testimony was contradictory regarding ERS's earnings available for distributions in 2017. The former wife fails to cite any authority for her arguments regarding the 2017 distributions. "'It is well settled that this court will not consider issues for which no legal arguments are developed and for which no authority is offered to support the appellant's contentions.' [May v. May, 292 So. 3d 385, 387 (Ala. Civ. App. 2019).]" Ezell v. Ezell, 394 So. 3d 608, 611 (Ala. Civ. App. 2024). " 'It is not the responsibility of [an appellate court] to construct arguments for a party.' " Ex parte M.P., [Ms. SC-2024-0684, Mar. 7, 2025] ___ So. 3d ___, ___ (Ala. 2025) (quoting Magers v. Alabama Women's Ctr. Reprod. Alts., LLC, 325 So. 3d 788, 790 (Ala. 2020)).

## 2018

The former wife argues that there was insufficient evidence to show that she had failed to comply with the divorce judgment as to 2018 distributions because, she says, no shareholder in ERS received a

distribution. She relies primarily on Williams v. Williams, 323 So. 3d 675 (Ala. Civ. App. 2020). In Williams, the parties' divorce judgment incorporated an agreement of the parties. The judgment awarded the wife 100% of the husband's retirement benefits with the Retirement Systems of Alabama ("the RSA") and ordered that the wife be responsible for preparing a qualified domestic relations order ("QDRO") assigning the husband's retirement benefits to the wife. The circuit court reserved jurisdiction to enter the QDRO, which it subsequently entered. The RSA refused to honor the QDRO on the authority of § 36-27-28(a), Ala. Code 1975. After the RSA had started paying the retirement benefits directly to the husband, who retained them, the wife commenced a civil action against the husband. That civil action was ultimately treated as a contempt proceeding. The circuit court determined that the husband was in contempt of court for accepting the benefits, which had been awarded to the wife.

On appeal, this court held that the husband had not willfully failed or refused to comply with the circuit court's order in Williams and, therefore, could not be held in contempt after the benefits were paid to the husband because the divorce judgment had not ordered the husband

not to accept his RSA retirement benefits if the RSA refused to honor the QDRO. This court reasoned that the husband's acceptance of those benefits could not constitute a violation of the divorce judgment and, therefore, could not constitute a basis for holding him in civil contempt for failing to comply with the court's judgment. Also, the divorce judgment had not ordered the husband to pay his RSA retirement benefits to the wife if RSA paid them to him, so, this court held, his failure to pay those benefits to the wife could not constitute a basis for holding him in contempt.

Williams is distinguishable from the present case. Williams involved a settlement agreement incorporated into a divorce judgment, an unenforceable QDRO drafted by the wife, and no contingent plan for the wife to receive the husband's retirement benefits that the husband had agreed to give to the wife. In this case, the divorce judgment provided that the former wife had the option to make an early lump-sum payment to complete her purchase of the former husband's 35% interest in ERS. However, until the former husband was divested of his ownership interest, he was to receive distributions in accordance with his shareholder percentage. The former wife's focus on the phrase "like any

27

other shareholder" ignores the phrase in the divorce judgment proceeding that the former husband "will receive income profit and loss distributions from the Corporation." (Emphasis added.) The divorce judgment did not state that the former husband would receive distributions only in the event that the former wife determined that ERS would make distributions in any given year. Moreover, the trial court found, based on the testimony and evidence, that the former wife had circumvented the terms of the divorce judgment by transferring money to herself in the form of increased wages and a loan, fulfilling the former wife's evident intention to not give the former husband another dime and to execute a "squeeze play." The ore tenus rule applies to judgments resolving disputed facts whether the dispute is based on oral testimony or on a combination of oral testimony and documentary evidence. See Rhodes v. Rhodes, 317 So. 3d 37 (Ala. Civ. App. 2023).

2019

The former wife asserts that the only 2019 distribution that the former husband would be entitled to would have been from January 2019 because she purchased the former husband's interest in ERS in late January 2019. The former wife argues again that she did not have an

28

affirmative duty to make a distribution to the former husband from ERS because she did not receive a distribution in January 2019. As explained above, the distributions to the former husband were not discretionary distributions.

## Postjudgment Interest

Last, the former wife argues that the trial court erred in awarding the former husband postjudgment interest pursuant to § 8-8-10, Ala. Code 1975. Section 8-8-10 provides:

> "(a) Judgments for the payment of money, other than costs, if based upon a contract action, bear interest from the day of the cause of action, at the same rate of interest as stated in the contract; all other judgments shall bear interest at the rate of 7.5 percent per annum, the provisions of Section 8-8-1[, Ala. Code 1975] to the contrary notwithstanding; provided, that fees allowed a trustee, executor, administrator, or attorney and taxed as a part of the cost of the proceeding shall bear interest at a like rate from the day of entry."

Section 8-8-10 applies to divorce judgments. As this court explained in Self v. Self, 290 So. 3d 431, 451 n.19 (Ala. Civ. App. 2019):

> "An unpaid property settlement incorporated into a divorce judgment may accrue interest so long as it is unpaid and the judgment fixes the amount owed. See, e.g., Morgan v. Morgan, 445 So. 2d 297, 299 (Ala. Civ. App. 1983) (interest on unpaid installments fixed by judgment); see also Ala. Code 1975, § 8-8-10 (providing for interest on a judgment). In the present case, however, the divorce judgment did not fix the amount of the teacher-retirement benefit owed by the former

29

husband to the former wife. See Alabama Dep't of Conservation & Nat. Res. v. Exxon Mobil Corp., 11 So. 3d 194, 203 (Ala. 2008) ('Section 8-8-10 applies only when the judgment is one for the payment of money, i.e., a "money judgment." ... On December 5, 2003, the trial court entered an order directing Exxon to pay future royalties "according to the plain, unambiguous language of the leases as reflected in the jury's verdict." This judgment did not constitute a money judgment for purposes of § 8-8-10. It did not adjudicate or fix an amount of future royalties owed the State by Exxon.'); and Elmore Cty. Comm'n v. Ragona, 561 So. 2d 1092, 1093 (Ala. 1990) ('Section 8-8-10 authorizes the payment of post-judgment interest as compensation for the loss of use of money as a result of the nonpayment of a liquidated sum for which liability has already been determined.')."

In Drey v. Petersen, 266 So. 3d 1101 (Ala. Civ. App. 2018), the husband was required to pay the wife $400,000 on or before May 20, 2005, and an additional $66,667 per year thereafter for several years as a property settlement. The husband did not pay all of those amounts to her. 266 So. 3d at 1106. A subsequent judgment in 2006 determined that the husband's remaining obligation owed to the wife to satisfy the 2005 property-settlement obligation was $241,127. The 2006 judgment, however, did not address postjudgment interest. This court concluded that the wife was entitled to collect postjudgment interest due to her for the late payment of the 2005 property settlement. In Hale v. Hale, 878 So. 2d 313, 322 (Ala. Civ. App. 2003), a wife was entitled to postjudgment

"interest [at the rate of 12 % per annum pursuant to § 8-8-10, Ala. Code 1975, as then in effect] on the portion of alimony in gross that ha[d] remained unpaid since the entry of the divorce judgment." "[I]f one of the yearly installments is not paid when due, interest would accrue from its due date and until paid." Morgan v. Morgan, 445 So. 2d 297, 299 (Ala. Civ. App. 1983). Because the amount of the money judgments in Drey, Hale, and Morgan, were readily ascertainable or fixed, the payee was entitled to postjudgment interest from the delinquent payor under § 8-8-10.

In Alabama Department of Conservation & Natural Resources v. Exxon Mobil Corp., 11 So. 3d 194 (Ala. 2008), Exxon Mobil Corp. sued the State, seeking a judgment declaring the proper method for calculating royalties for leases on natural-gas fields in Mobile. The State filed a counterclaim alleging breach of contract and fraud. Ultimately, the State was awarded damages on its breach-of-contract claim against Exxon Mobil in connection with certain unpaid oil and natural-gas royalties. The parties agreed, among other things, that Exxon Mobil owed the State $26,266,395 in royalties from January 2003 to January 31, 2008. On appeal, the State argued that under § 8-8-10, which then provided for an

31

interest rate of 12%, Exxon Mobil owed an additional $6,898,725 in postjudgment interest on the additional royalty amount of $26,266,395 from December 5, 2003, until Exxon Mobil satisfied the judgment on January 31, 2008. The State contended that the trial court's declaratory judgment of December 5, 2003, which had ordered Exxon Mobil to calculate future royalty payments "according to the plain, unambiguous language of the leases as reflected by the jury's verdict" had the effect of incorporating into that judgment each monthly royalty payment as it came due. Thus, the State argued that it was entitled to postjudgment interest pursuant to § 8-8-10 from the date of the declaratory judgment on December 5, 2003, until Exxon Mobil had satisfied the judgment on January 31, 2008. Our supreme court held:

> "Section 8-8-10 applies only when the judgment is one for the payment of money, i.e., a 'money judgment.' See Bank Independent v. Coats, 621 So. 2d 951 (Ala. 1993) (holding that judgment following jury's verdict declaring there was no fraudulent conveyance was not a money judgment entitling wife to 12% postjudgment interest). Following the entry of judgment on the jury's verdict in this case, Exxon sought guidance from the trial court on how to apply the jury's verdict to future royalty-payment computations. On December 5, 2003, the trial court entered an order directing Exxon to pay future royalties 'according to the plain, unambiguous language of the leases as reflected in the jury's verdict.' This judgment did not constitute a money judgment for purposes of § 8-8-10. It did not adjudicate or fix an amount of future

royalties owed the State by Exxon. Rather, the judgment simply informed Exxon that it was to compute future royalties according to the leases as interpreted by the jury. Accordingly, because the trial court's December 5, 2003, judgment did not constitute a money judgment, the State is not entitled to postjudgment interest pursuant to § 8-8-10 from the period December 5, 2003, through January 31, 2008"

11 So. 3d at 203.

In this case, the divorce judgment did not adjudicate or fix an amount of distributions owed to the former husband. Without a fixed sum, postjudgment interest was not recoverable under § 8-8-10. Accordingly, the trial court's award of postjudgment interest on the distributions from 2016 to 2019 must be reversed.

<u>Conclusion</u>

The judgment of the trial court is affirmed insofar as it found the former wife in contempt for failing to make certain shareholder distributions to the former husband; however, we reverse the judgment insofar as it awards the former husband postjudgment interest pursuant to § 8-8-10 and we remand this case for the entry of a judgment consistent with this opinion.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

Fridy and Bowden, JJ., concur.

Moore, P.J., and Edwards, J., concur in the result, without opinions.